RIVER TERRACE CONDOMINIUM ASSOCIATION, APPELLEE, *v.* LEWIS, APPELLANT, ET AL.

(No. C-850657 — Decided July 16, 1986.)

*Paxton & Seasongood* and *Jack F. Fuchs,* for appellee.

*Cors, Bassett, Kohlhepp, Halloran & Moran, James W. Halloran* and *David L. Barth,* for appellant.

*Per Curiam.* Plaintiff-appellee, River Terrace Condominium Association ("Association"), obtained an order permanently enjoining defendant-appellant, Dora Stewart Lewis,[1] from refusing to give access to Unit 2-B in the River Terrace Condominium (the "Condominium") so that the Association could spray to exterminate cockroaches. The injunction was issued after the trial court sustained the Association's motion for summary judgment. Dora Stewart Lewis appeals, contending, in two assignments of error, that the Association failed to establish any legal right to enter Unit 2-B to spray insecticides and that summary judgment should not have been rendered under Civ. R. 56(C) because there remain outstanding several genuine issues of material fact. We find no error in the final judgment below, and we affirm it.

The facts pertinent to this appeal[2] are not complicated. Beginning in the first floor lobby of the Condominium, cockroaches were discovered in the common areas and certain "units" on the first, second and third floors. On the second floor, they were found in the hallway outside appellant's Unit 2-B and in an adjoining unit that shares a common wall with Unit 2-B. An exterminating company was engaged to spray insecticide to eliminate the infestation on a planned basis, treating half the infested areas and units on one visit and the other half on the next visit two weeks later.

Lewis refused to allow the exterminator to enter her unit, stating in her letter of January 26, 1985 that: "I *cannot* tolerate spray, also the residuals left. I lost one of my dogs because of an overloading to her system of 'phenols' years ago."[3] She testified at the hearing on a preliminary injunction that she had never seen any cockroaches in Unit 2-B (the Association had no proof to the contrary), and that if the spraying were allowed, she would leave the Condominium.[4]

On February 10, 1985, the board of

---

[1] Judge Black stated at the commencement of oral argument in this appeal that only upon entering the courtroom did he realize that he knew the appellant and that he would recuse himself if counsel on either side felt that it was necessary by reason of actual impartiality or an appearance of impartiality. Counsel for both parties responded that they could perceive no risk of partiality, and they had no objection to Judge Black's participation in this appeal.

[2] Initially, the association sought to enter two units for two purposes: to replace valves in the heating, ventilating and air conditioning system and to spray against cockroaches. The two units were 1-D and 2-B. In appellant's brief and at oral argument on appeal, we were advised that Dora Stewart Lewis no longer occupies Unit 1-D under a lease (as she had) and that she granted access for valve replacement in Unit 2-B. This appeal, therefore, is focused

only on the injunction allowing entry into Unit 2-B for spraying insecticides.

[3] Lewis concluded her letter as follows:
"I am having this copied. A copy will go to the executor of my estate. I want West Shell to sign a statement accepting responsibility, knowingly involving in my health [*sic*] in adverse ways. That statement is not signed and the apartment is sprayed and due to my work I die — West Shell can be sued by my heirs as a contributor to my demise by using unnatural unhealthy means of pest controlling on 'their' deciding in conjunction with other products employed in the building under 'their' management, my resting place."

[4] The extent of appellant's testimony about her reason for refusing entry for spraying was as follows:
"Q. Have you ever seen any roaches in Unit 2-B?

trustees (the statutory board of managers) of the Association adopted the following resolution at a special meeting:

"Resolved that the Board of the River Terrace Association take any measures necessary for the extermination of roaches in all apartments and common areas in the River Terrace and further take any necessary action to accomplish same."

A copy of the resolution was delivered to Lewis that day, but she continued to deny entry for spraying. At the regular meeting of the board of trustees held on February 19, 1985, the board appointed a committee that was empowered to file suit for the Association, but decided "to approach the growing problem" by three steps; give two Association members a chance to see if they could obtain cooperation from Lewis; consult the board of health; and finally proceed to "[g]o forward at once with a lawyer." The instant action for injunctive relief followed.

A full evidentiary hearing was held on the Association's motion for a preliminary injunction, during the course of which the Association's expert testified that cockroaches "carry bacteria and other things that would lead to disease-producing organisms"; that they nest in clusters and leave droppings that contaminate wherever they live, migrate along conduits, electrical wiring, plumbing lines, and air conditioning ducts; and that they move away from areas that have been sprayed with insecticides. The expert was of the opinion that if cockroaches were found on two sides of a unit, there is "a very good likelihood" that the insects will be found in that unit, especially if it is untreated. Other than general statements about the effect of insecticides on humans, Lewis presented no evidence of any nature upon which a trier of fact could conclude that the insecticides being used in the Condominium would, with reasonable certainty, adversely affect her health.

The Association had sought a preliminary injunction allowing entry into appellant's unit for two purposes: to spray insecticides and to replace valves in the heating, ventilating and air conditioning ("HVAC") system. While the court issued a preliminary injunction allowing entry for the replacement of HVAC valves,[5] it declined to do so for the roach problem, stating that "The evidence does not indicate that the failure to grant a preliminary injunction *prior to the final hearing* would cause irreparable injury to the plaintiff." (Emphasis added.) However, the court found that there was evidence of cockroaches in Unit 2-B and the board "was not arbitrary in fulfilling the authority placed in it by statute and the Declaration and By-Laws of the condominium association." The court concluded that the Association had a "right of access to deal with the roach problem."

No further evidentiary hearings were held. About a month after the order on the preliminary injunction,

---

"A. No.

"Q. Now, have you denied access to the building association to Units 1-D and 2-B for spraying insecticide?

"A. Yes.

"Q. And if that spraying is allowed, could you tell us how that would affect your view as to living at River Terrace?

"A. I'd leave.

"Q. You would?

"A. I'd leave."

On cross-examination, appellant conceded that she was not living in Unit 2-B at that time and entered that unit only from time to time.

[5] Appellant later conceded the Association could enter Unit 2-B to replace HVAC valves. See fn. 2.

the Association filed a motion for summary judgment and later filed an affidavit in substantiation of its position that the decision to enter Unit 2-B was reasonable. Lewis countered with a memorandum and two affidavits, hers and that of her expert, Dr. Susan W. Fisher, both of which will be discussed in detail below. After reviewing the several affidavits, the appellant's answers to interrogatories and the transcripts of the evidence taken at the hearing on the preliminary injunction, the trial court found that reasonable minds could only come to the conclusion that the Association was acting reasonably within its authority, that the Association's means of "spraying for roaches" was reasonable, and that there was no evidence that the use of insecticides in this instance was excessive or any way injurious to the health of the occupants of the Condominium. The court found that the Association had no adequate remedy at law and was entitled to an order permanently enjoining Lewis from refusing access to Unit 2-B for spraying to exterminate cockroaches. An injunction was issued, and this appeal followed.

In her first assignment of error appellant contends that the Association "failed to establish any legal right to enter Unit 2-B to spray insecticide." We disagree because we find the right of entry is patent.

Under R.C. Chapter 5311 and the Declaration and By-Laws for this Condominium, while the owner of a unit has exclusive ownership of and responsibility for his unit, R.C. 5311.03(B), the owner's freedom of action is of necessity limited by the fact that the

unit is one of many units (in this instance one of fifty-seven) that are physically and legally supported by, and supportive of, all other units and the common areas. It is not an independent, separate entity in the nature of a castle. Under Section 2, Article V of the Declaration and the By-Laws, unit ownership extends only to "the undecorated interior surfaces of the perimeter walls" and does not include the conduits, wires, pipes and ducts within those boundaries that serve any other unit. All the rest of the Condominium constitutes "common areas." (Paragraph 5 of Definitions.) See, also, R.C. 5311.03(D) and 5311.01(B). Thus, all of the conduits, wires, pipes and ducts that carry utility and other services throughout the Condominium are "common areas," and these are the highways through which the insects and other pests including cockroaches travel and migrate. They enter and leave individual units along these highways. In the nature of things, an infestation of cockroaches in the Condominium is a common problem, not an individual problem.

Under R.C. 5311.03(F),[6] each unit is "subject to the right of access for the purpose of maintenance, repair, or service of [1] any common area and facility located within its boundaries or [2] of any portion of the unit itself * * *." The entry must be authorized by the board of managers (the board of trustees, in the instant case), and no maintenance of a portion of the unit may be authorized unless it is necessary in the board's opinion for "public safety" or to prevent damage to any other part of the condominium. We

---

[6] R.C. 5311.03(F) reads:

"Each unit shall be subject to the right of access for the purpose of maintenance, repair, or service of any common area and facility located within its boundaries or of any portion of the unit itself by persons authorized by the board of managers of the unit owners association. No maintenance, repair, or service of any portion of a unit shall be authorized, however, unless it is necessary in the opinion of the board of managers for public safety or in order to prevent damage to or destruction of any other part of the condominium property."

construe "public safety" to mean "common safety of the occupants of the condominium," because we believe it is not intended that the board of managers can act only when the perceived danger is to the general public.

This right of entry is also set forth in Section 2, Article XIV of the Declaration and By-Laws as follows:

"*Section 2. Right of Entry for Repair, Maintenance and Restoration.* The Association shall have a right of entry and access to, over, upon and through all the Condominium Property, including each Unit, to enable the Association to perform its obligations, rights and duties pursuant hereto with regard to maintenace, repair, restoration and/or servicing of any items, things or areas of or in the Condominium Property."

There is no question in our minds that the extermination of cockroaches from a condominium falls within the meaning of "maintenance." The Association established that it had a legal right of entry to spray the insecticides, and under R.C. 5311.19 and 5311.23, the Association was fully entitled to enforce its right of access.

The second assignment of error proposes that since there remained five genuine issues of material fact, the trial court erred when it granted summary judgment.[7] Appellant contends that the unresolved issues were: whether the spraying was necessary at all; whether it would have any effect on the infestation; whether it would have an adverse effect on humans; whether cockroaches could cause physical damage to the Condominium; and whether their extermination would eliminate any real health hazards. We find no merit in the assignment of error because appellant has misconceived the issues before the trial court at the time.

Under the peculiar procedural posture of the case, the court had already heard the evidence produced at the hearing on a preliminary injunction. Thus, the court had come to the following pivotal conclusions about the merits of the Association's claim: (1) that there was evidence of cockroaches being in "apartments" near Unit 2-B, and (2) that the board of trustees had not acted arbitrarily when it decided that the pesticides must be applied to *all* units, made another attempt to "obtain cooperation" from Lewis, and authorized legal action as a last resort. The trial court, however, deferred action on the Association's request for an injunction, because it saw no irreparable damage to the Association that would be caused by the delay.

The real question before the court when the Association filed its motion for summary judgment was whether there was any need for a further evidentiary hearing. Since the merits of the case had been addressed at an

---

[7] Nothing in this decision is intended to approve the general use of summary judgment under Civ. R. 56 to dispose of claims for equitable relief, which usually require a "balancing of the equities" under all pertinent facts and circumstances. There may be conflicts between the respective versions of the facts and circumstances as perceived by the plaintiff and the defendant. However, when there are no disputed facts (for instance, when all facts are stipulated by the parties) and one party is entitled to relief on established principles, summary judgments have been affirmed. *Cunningham* v. *J.A. Meyers Co.* (1964), 176 Ohio St. 410, 27 O.O. 2d 379, 200 N.E. 2d 305. "We are satisfied that Rule 56 authorizes a summary judgment in a proper case in an action formerly cognizable solely in equity." *Booth* v. *Barber Transp. Co.* (C.A. 8, 1958), 256 F. 2d 927, 931 (no factual dispute about the determinative facts); *Dale* v. *Preg* (C.A. 9, 1953), 204 F. 2d 434 (specific performance of a real estate contract that the court thought contained no ambiguity).

evidentiary hearing (even though it was a preliminary hearing), and a ruling had been made on the merits, a motion for summary judgment was not the proper procedural device to reach a final disposition of the lawsuit. A summary judgment motion raises the question of whether the merits of the claim should ever be addressed in an evidentiary hearing. The procedure was far beyond that point in the instant case. The use of summary judgment as a procedural device to bring the case to a final conclusion is not claimed as an error, but we believe that its use was not authorized by Civ. R. 56.

Nevertheless, we hold that the trial court did not err when it issued the permanent injunction.

The core issue before the court was whether the decision by the board of trustees to enter Unit 2-B in the interest of common (public) safety was valid and enforceable. In reviewing such a decision, as in reviewing the validity of any rule adopted by a board of managers of a condominium association, the trial court does not substitute its judgment for that of the board of managers or weigh the various elements and considerations to be taken into account as though the court were acting *de novo.* Instead, the court applies the test of reasonableness; that is, the court determines whether under all the facts and circumstances disclosed by the evidence, the action taken (or the rule adopted) by the board of managers was reasonable. We believe there are three major questions subsumed in the test of reasonableness: (1) whether the decision was arbitrary or capricious; (2) whether it was nondiscriminatory and even-handed; and (3) whether it was made in good faith for the common welfare of the owners and occupants of the condominium.[8]

In the instant case, the trial court had decided that the decision to enter Unit 2-B to protect the condominium

---

[8] The test of reasonableness has been used in Ohio in reviewing condominium rules, *Prestwick Landowners' Assn.* v. *Underhill* (1980), 69 Ohio App. 2d 45, 23 O.O. 3d 36, 429 N.E. 2d 1191, as it has been applied in other states. *Schmeck* v. *Sea Oats Condominium Assn., Inc.* (Fla. App. 1983), 441 So. 2d 1092; *Dulaney Towers Maintenance Corp.* v. *O'Brey* (1980), 46 Md. App. 464, 418 A. 2d 1233. See, generally, Note, Judicial Review of Condominium Rulemaking (1981), 94 Harv. L. Rev. 647.

The first question in applying the test of reasonableness is whether the decision or rule was arbitrary or capricious. This requires, among other things, that there be some rational relationship of the decision or rule to the safety and enjoyment of the condominium. *Hidden Harbour Estates, Inc.* v. *Norman* (Fla. App. 1975), 309 So. 2d 180; *Ryan* v. *Baptiste* (Mo. App. 1978), 565 S.W. 2d 196.

The second question is whether the decision or rule is discriminatory or even-handed. This may sound like a "constitutional" consideration applicable only in case of "state action," see *Shelley* v. *Kraemer* (1948), 334 U.S. 1, but we believe it protects against the imposition by a majority of a rule or decision reasonable on its face, in a way that is unreasonable and unfair to the minority because its effect is to isolate and discriminate against the minority. It provides a safeguard against a tyranny of the majority.

The third question is whether the decision or rule was made in good faith for the common welfare of the owners and occupants of the condominium. It is derived from *Rywalt* v. *Writer Corp.* (1974), 34 Colo. App. 334, 526 P. 2d 316, and *Papalexiou* v. *Tower West Condominium* (Ch. Div. 1979), 167 N.J. Super. 516, 401 A. 2d 280, in which the good faith required of a corporate board of directors is analogized to that required of a condominium board of managers. Both boards owe a duty of good faith in managing property held in common by a group of owners. We believe good faith is an essential ingredient of a reasonable decision or rule.

against the infestation of cockroaches was reasonable. While the court did not so state, we assume it found that the Association had carried its burden as plaintiff to prove its entitlement to an injunction by clear and convincing evidence.

We hold the evidence was sufficient to support this conclusion. The infestation of cockroaches could not be tolerated and demanded action; the means of extermination was a customary means reasonably related to eliminating the threat to the safety and enjoyment of the condominium; the plan was to spray insecticides only where cockroaches were found; *all* residential units in the condominium were subject to spraying in a nondiscriminatory fashion; and the decision to enter Unit 2-B and all other infested units was made in good faith for the common welfare of River Terrace's owners and occupants.

The evidence offered by appellant Lewis to prove that the extermination plan was unreasonable was sketchy: appellant had seen no cockroaches in Unit 2-B; she could not tolerate the spray or "residuals"; her dog had died years ago of "overloading" of "phenols"; and the pest control used was an "unnatural, unhealthy means." This makes it obvious that the proposed spraying was distasteful to Lewis, but we note the absence of any claim or evidence that the specific chemical substances used by the exterminator, the concentration proposed, the durability and toxicity of the "residuals" or the harmful effects on appellant's own health would make the spraying of her unit an unreasonable procedure.

The Association's motion for summary judgment was, in effect, a motion for judgment on the evidence before the court. Appellant responded with her affidavit and the affidavit of Dr. Susan W. Fisher, her expert, in opposition to the rendering of final judgment without a further evidentiary hearing. Lewis' affidavit added nothing new, because in it she said, as she had said before, that she had never seen a cockroach in Unit 2-B. The court could reasonably infer from the Association's evidence that in the absence of any cockroaches, the unit would not be sprayed.

The Fisher affidavit contains several general statements: that since insecticides used to control cockroaches inhibit their central nervous systems, the insecticides are "capable" of affecting humans if used excessively without "proper arrangements"; that insecticides have not been proven to be safe in all circumstances; that "[c]ockroaches have not been shown to cause any physical damage to *structures*" (emphasis added); that they "are not transmitters of human disease," but simply "track conditions caused by humans," and they do this less efficiently than "other trackers"[9]; and that continued signs of roaches can be explained by (1) their coming from another location, (2) their migrating from an untreated location which should show evidence of such migration, and (3) their development of a resistance to the chemicals used. We hold that even if we accept these general, abstract statements as true, they do not reflect negatively on the reasonableness of the Association's determination to act on the concrete, immediate threat of spreading infestation experienced on February 19, 1985. These statements speak of possibilities, not

---

[9] Since the affidavit did not define Dr. Fisher's terms, we fail to comprehend the significance of the difference between "transmitters" of human disease and "trackers" of those diseases. The affidavit does not appear to us to controvert the testimony of the Association's expert that cockroaches "carry" disease-producing organisms.

probabilities. We cannot say that the trial court's decision not to hold another evidentiary hearing on the merits of the Association's claim for relief was erroneous, taking into consideration the totality of circumstances disclosed by the record. The second assignment of error has no merit.

The judgment of the trial court is affirmed.

*Judgment affirmed.*

SHANNON, P.J., BLACK and HILDEBRANDT, JJ., concur.