**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as** *Michael v. Miller*, **Slip Opinion No. 2022-Ohio-4543.]**

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2022-OHIO-4543

MICHAEL, APPELLEE *v.* MILLER, APPELLANT, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Michael v. Miller*, Slip Opinion No. 2022-Ohio-4543.]**

*Equitable liens—Before recognizing an equitable lien, a court must find a duty, debt, or obligation; an identifiable res; and an express or implied intent that property serve as security for payment of a debt or obligation, and it may also take into account traditional equitable considerations, such as whether third parties had notice of outstanding equitable interest, extent to which party seeking relief has come to court with clean hands, and whether that party has taken all reasonable steps to ensure that it obtained perfected lien—Parties to separation agreement lacked express or implied intent that ex-husband's stock would serve as security for his current obligation to pay monthly spousal-support payments in addition to his future quarterly obligation—Court of appeals' determination that ex-wife held equitable lien on ex-husband's stock securing his current monthly obligation reversed.*

(No. 2021-0361—Submitted March 8, 2022—Decided December 19, 2022.)

APPEAL from the Court of Appeals for Cuyahoga County,

No. 109121, 2021-Ohio-307.

_____

**STEWART, J.**

{¶ 1} In this discretionary appeal, there is no question that a perfected lien on stock shares in an Ohio corporation exists to secure six years of spousal-support payments set to begin in 2034. But we are asked to determine whether an equitable lien on the stock also exists to secure a current support obligation lasting 20 years. Third-party defendant-appellant, Cody Miller, appeals from a judgment of the Eighth District Court of Appeals, which concluded that plaintiff-appellee, Karen Michael (formerly known as Karen Miller), holds an equitable lien on the stock securing defendant-appellee David Miller's current obligation to pay Karen monthly spousal-support payments (totaling $3.6 million) over 20 years, in addition to the lien Karen holds on the stock to secure David's obligation to pay quarterly support payments (totaling $450,000) beginning in 2034. 2020-Ohio-307, ¶ 45-51. We conclude that an equitable lien does not exist on the stock to secure the current obligation, and we reverse the Eighth District's judgment.

## I. FACTS AND PROCEDURAL HISTORY

{¶ 2} Karen Michael and David Miller were married in 1993. Cody is David and Karen's son. Ronald Miller, David's father and Cody's grandfather, owned a business, Ram Sensors, Inc. In 2009, Ronald gifted to David and Cody, who was 15 years old at the time, each 50 percent of the shares of Ram Sensors stock. David subsequently became the president of the company. Ronald also gifted Cody funds that "were held in a Vanguard brokerage account."

{¶ 3} Karen filed for divorce against David in November 2013. Karen and David entered into a separation agreement that was incorporated into their final judgment entry of divorce in January 2015. The separation agreement provided

that David would pay Karen spousal support in the amount of $15,000 a month for 20 years, terminating in December 2034. The agreement also provided that upon completion of the monthly support payments, David would pay Karen additional spousal support in 24 quarterly payments of $18,750 for six years, totaling $450,000.

{¶ 4} David and Karen's separation agreement also stated that David would repay Cody all monies due to him that David had withdrawn from Cody's Vanguard accounts and from Ram Sensors distributions to which Cody was entitled for the years 2011 through 2014.

{¶ 5} Karen also agreed to relinquish all rights and interest that she may have had in Ram Sensors, and David agreed to secure his spousal-support obligations by executing a cognovit note and stock-pledge agreement. David further agreed that he would not "encumber, transfer, assign, pledge or otherwise alienate his interest" in Ram Sensors without Karen's prior written consent.

{¶ 6} Soon after the divorce decree was finalized, David executed a cognovit note in the amount of $450,000 to be paid to Karen. David and Karen also entered into a stock-pledge agreement in which David pledged all of his Ram Sensors stock to Karen in consideration of and as security for the cognovit note.

{¶ 7} In November 2015, Cody and Ram Sensors filed suit against David in the Cuyahoga County Common Pleas Court "to both recover the funds stolen from [Cody] and to protect Ram Sensors." Cody alleged that David had breached his fiduciary duties and had misappropriated funds belonging to Cody and Ram Sensors. According to Cody, Karen told him that David had "stole[n] funds from [Cody's] Vanguard brokerage account [and] distributions to [Cody] from Ram Sensors, and that [David] was mismanaging and attempting to destroy Ram Sensors so that he would not have assets to pay [Karen]." Karen also gave Cody "many years worth of Ram Sensors bank statements, financial statements, and tax returns," which "provided the factual basis for [Cody's] claims" against David.

{¶ 8} In September 2016, Karen recorded a Uniform Commercial Code ("UCC") financing statement with the Ohio Secretary of State. The UCC financing statement describes the security interest as follows:

> Pursuant to the terms of a certain agreement between [David] and [Karen] entitled "Pledge Agreement," dated January 22, 2015, the security interest described herein is a first position lien on all of [David's] right, title and interest in and to [David's] equity interest in Ram Sensors Inc., an Ohio Subchapter S corporation, including all classes of stock whether certificated or uncertificated.

{¶ 9} Cody and David entered into a settlement agreement, which the trial court approved, entering an agreed order in April 2017 against David for $2,874,437.56 with interest. According to the agreed order, David was required to transfer all his stock in the company to Cody except as noted in the settlement agreement:

> David Miller is the true and lawful owner of the David Miller Stock [defined in the settlement agreement as David's 50% of Ram Sensors stock], he has not sold, transferred, assigned, conveyed, mortgaged, pledged or otherwise hypothecated or encumbered the David Miller Stock except pursuant to the certain stock pledge agreement provided in favor of Ms. Karen Michaels as evidence in *Disclosure Schedule 3.1* hereto.

(Boldface and italics sic.) The Disclosure Schedule 3.1 attached to the settlement agreement was the cognovit note for $450,000 and the stock-pledge agreement securing the cognovit note. According to Cody, he knew that Karen had a lien on

4

David's Ram Sensors stock to secure the $450,000 obligation, which would become "due to her on December 31, 2034." That is why he "agreed to take [David's] 50% of Ram stock subject to [his] mother's lien."

{¶ 10} Three weeks after the general-division litigation between Cody and David had concluded, Karen filed a postdecree pleading in her and David's divorce case in the domestic-relations division of the court of common pleas: a motion seeking transfer to Karen of David's 50 percent share of Ram Sensors stock pledged to her in the divorce and a request for a judgment declaring that David had assigned to her his rights to the stock and that David's transfer of the stock to Cody was "an illegal transfer." Nine months later, after requesting three continuances in the matter, Karen withdrew the postdecree pleading.

{¶ 11} Less than one month after Karen withdrew her postdecree pleading in the domestic-relations court and nearly one year after Cody and David settled their case in the general division, Karen attempted to intervene in the general-division case between Cody and David. She also filed a motion requesting that the court vacate the agreed judgment between Cody and David. The court denied her motions, and Karen appealed to the Eighth District. *Miller v. Miller*, 2019-Ohio-1886, 135 N.E.3d 1271 (8th Dist.).

{¶ 12} Karen argued in the Eighth District that intervention in the case was necessary "to protect her interest in David's 50 percent RAM Sensors stock" because "David's share of the stock [was] security for David's spousal support obligations—both current and future—and the conveyance of David's interest in the stock as partial satisfaction of the judgment was illegal." *Id.* at ¶ 31. The Eighth District rejected her arguments, explaining:

> Karen's interest in David's share of the RAM Sensors stock
> * * * is a lien that becomes due in the future; it is not a present
> interest in ownership of the stock. As part of the divorce settlement,

David agreed to pay Karen $450,000 in additional support beginning December 2034. He then executed a cognovit note in the amount of $450,000 and secured it with a lien on his share of RAM Sensors stock, which was perfected by a stock pledge agreement and recorded with the Ohio Secretary of State. And the record shows that the transfer of David's 50 percent share to Cody was made subject to Karen's interest. Karen's interest in the stock, as a secured creditor, is therefore preserved. The evidence does not support Karen's argument that documents were executed entitling her to immediate transfer of David's stock for satisfaction of David's current support indebtedness, i.e., a new stock agreement, cognovit note, or UCC statement.

*Id*. at ¶ 32. The appellate court further reasoned:

Karen's purported interest in the action is that of a lienholder—she has a lien on David's share of RAM Sensors stock that was transferred to Cody in partial satisfaction of the money judgment. Karen's interest in the stock becomes due in 2034, and the record establishes, through the settlement agreement and Cody's affidavit, that Cody takes David's stock subject to the lien created by the stock pledge agreement between Karen and David. The underlying action did not seek to foreclose or extinguish Karen's lien. And Karen fails to demonstrate how the disposition of the underlying action in her absence may impair or impede her ability to protect this interest.

*Id*. at ¶ 36. The Eight District affirmed the trial court's denial of Karen's motions to intervene and vacate the agreed judgment entry. *Id*. at ¶ 44-46.

6

**{¶ 13}** In January 2019 (before the Eighth District released its decision in *Miller*), Karen filed another postdecree pleading in her and David's divorce case in the domestic-relations court: a complaint for a declaratory judgment and other equitable relief. This time, however, she named David and Cody as defendants. She sought a declaration that David's ownership of the Ram Sensors stock "secure[d] all [his] obligations" under the parties' divorce decree, including his monthly spousal-support payments. She further requested that the court order Cody to transfer and convey David's stock to her and order Cody to pay her "maintenance and support payments" because Cody had subjected himself to liability to Karen "by taking subject to her lien, her security for the payments."

**{¶ 14}** Cody filed an answer and a counterclaim against Karen for declaratory judgment, seeking, among other things, a declaration regarding the parties' respective ownership interests in Ram Sensors and that he was not personally responsible for David's obligations to Karen.

**{¶ 15}** Karen and Cody filed competing motions for summary judgment. In its decision, the trial court explained that "[a]t issue [was] whether Karen's security interest in the Ram stock extend[ed] to the monthly support payments due 2014-2034." The court found that "the express intent of the parties was that David would execute a cognovit note and stock pledge to secure the 240 monthly support payments, as well as the later quarterly support payments." The court granted Karen's motion in part, concluding that she held a perfected lien on the Ram Sensors stock securing the quarterly payments totaling $450,000 beginning in 2034 and an equitable lien on the stock securing the monthly spousal-support payments from 2014 until 2034.

**{¶ 16}** Cody appealed to the Eighth District,[1] arguing in part that "[t]he trial court erred in creating an equitable lien securing the entire spousal support obligation when the UCC financing statement recorded by Karen demonstrates that the lien contemplated by the divorce decree is to secure the $450,000 spousal support obligations." 2021-Ohio-307 at ¶ 29. He further argued that "[t]he trial court erred in creating an equitable lien on the RAM Sensors Stock when the parties created an actual, express lien that was properly perfected." *Id.*

**{¶ 17}** In a two-to-one decision, the Eighth District affirmed. The majority agreed with the trial court's finding that Karen and David intended to secure both the current monthly and the future quarterly spousal-support payments with the cognovit note and stock pledge. *Id.* at ¶ 50-51.

**{¶ 18}** Cody appealed the Eighth District's decision to this court, and we accepted the appeal on his two propositions of law:

> Proposition of Law No. 1: Ohio Court[s] must strictly adhere to policies supporting the princip[les] of the UCC and should limit application of equitable remedies, including the imposition of equitable liens, which impair or undermine the purpose of the UCC.
>
> Proposition of Law No. 2: An equitable lien should not be liberally extended to the prejudice of third-party creditors and the general public. Rather, an equitable lien should be established only after balancing the competing interests of the purported creditor, debtor, third-party creditors, and the public interest.

*See* 163 Ohio St.3d 1490, 2021-Ohio-2097, 169 N.E.3d 1268.

---

1. Karen cross-appealed to the Eighth District, but her arguments in support of the cross-appeal are not relevant to the appeal before us.

## II. LAW AND ANALYSIS

**{¶ 19}** There is no dispute in this case that Karen has a lien on David's Ram Sensors stock shares that he transferred to Cody to secure the $450,000 in support that David must begin paying Karen in 2034. At issue in this case is whether Karen also has an equitable lien on David's stock securing his obligation to pay Karen $15,000 of support a month from 2014 until 2034, totaling $3.6 million.

### A. Eighth District's Decision

**{¶ 20}** A majority of the Eighth District panel agreed with the trial court's finding that the plain language of Karen and David's separation agreement reflected that they both intended for David's Ram Sensors stock shares to secure his current spousal-support obligation as well as his future one. The trial court relied on the following provisions of the separation agreement:

> "Husband has an interest in Miller Wire & Cable Co. Inc. and RAM Sensors, Inc. In consideration of the terms of this Agreement and the specific terms set forth hereinbelow. Wife relinquishes all right[,] title[,] and interest she may have to the assets and income of both entities except that Husband shall secure his obligations by assigning to Wife his interest in RAM Sensors, Inc. to secure the payments due to Wife. Husband shall execute a Cognovit Note and stock pledge to secure the payments and he shall not encumber, transfer, assign, pledge or otherwise * * * alienate his interest in RAM Sensors, Inc. without Wife's prior written authorization until he has satisfied his obligations herein."

2021-Ohio-307 at ¶ 36, quoting Section 2.E of the separation agreement.

**{¶ 21}** The Eighth District explained that "[t]he trial court concluded that the use of 'the plural: obligations, payments' unambiguously in the agreement

9

means that the 'clause applies to more than one obligation, more than one payment.' " *Id.* at ¶ 37. According to the Eighth District, the trial court therefore found that "plural 'payments' " included all of David's obligations to Karen: " 'the monthly spousal support payments (Section 3(B)); the quarterly spousal support payments (Section 3(D)); and $10,000 spousal support towards legal fees (Section 10)." *Id.*

**{¶ 22}** The Eighth District acknowledged that David executed the stock-pledge agreement and cognovit note "on January 22, 2015, within 30 days of the divorce decree in accord with Section 17," *id.* at ¶ 43, that "[t]he [stock] pledge agreement lists as consideration the promissory note executed concurrently and states that it is issued 'pursuant to a Separation Agreement dated on or about the date hereof,' " *id.* at ¶ 44, that the note was issued for $450,000, and that "[t]he UCC-1 financing statement filed September 23, 2016, describes a secured interest in the RAM Sensors stock pursuant to the January 22, 2015 pledge agreement," *id.* But despite these documents, most of them executed nearly contemporaneously with the separation agreement, the Eighth District "agree[d] with the trial court's determination that the parties' intent as reflected by the plain language of the agreement was to secure the quarterly spousal support payments and the monthly spousal support payments." *Id.* at ¶ 45.

**{¶ 23}** The Eighth District added:

> Our conclusion is bolstered by the provision in [Section] 2E [of the separation agreement] that "Husband shall secure his obligations by assigning to Wife his interest in RAM Sensors, Inc. to secure the payments due to Wife. Husband shall execute a Cognovit Note and stock pledge to secure the payments." It is further supported by the statement in Section 3B setting forth the monthly payment provision: "[t]he parties acknowledge that the

term of support is extended to satisfy Husband's obligation to pay Wife some value for the business interests."

*Id.*, 2021-Ohio-307, at ¶ 46.

{¶ 24} The Eighth District concluded that the $450,000 stock interest in Ram Sensors was a perfected lien against the quarterly spousal-support payments, noting that it had "recognized that fact in [*Miller*] where [it] stated that Karen's secured interest of $450,000 for the RAM Sensors stock is a perfected 'lien that becomes due in the future; it is not a present interest in ownership of the stock.' " *Id*. at ¶ 47, quoting *Miller*, 2019-Ohio-1886, 135 N.E.3d 1271, at ¶ 32. The appellate court then stated, "However, as the trial court declared, the 'express intent of the parties was that David would execute a cognovit note and stock pledge to secure the 240 monthly support payments, as well as the later quarterly support payments.' " *Id*. at ¶ 48. The Eighth District observed that David did not execute a note and pledge to "also * * * cover the monthly payments," *id.*, but it agreed with the trial court's conclusion that Karen had an equitable lien on David's 50 percent share of the Ram Sensors stock to cover the monthly spousal-support payments, *id*. at ¶ 49-51.

### B. Analysis

{¶ 25} Cody argues that the Eighth District erred when it did not consider "the impact of such equitable liens on third-party or non-party intervening creditors." He maintains that "to establish an equitable lien[,] traditional equitable factors should be required, *to wit*, the effect on third-parties, whether the equitable lien is injurious to the general public, and whether the proponent of the equitable lien has come to the court with clean hands." (Italics sic.) Karen argues that it was "not the stock pledge that Cody focuses upon that created Karen's lien on David's shares," but rather, as the trial court found and the Eighth District affirmed, it was "the separation agreement and divorce decree."

**{¶ 26}** A lien is " 'a hold or claim which one person has upon the property of another as a security for some debt or charge.' " *State ex rel. Tennant Fin. Corp. v. Davis*, 111 Ohio St. 569, 574, 146 N.E. 82 (1924), quoting *Bouvier's Law Dictionary*. "A lien becomes equitable in character when satisfaction of the lien is sought from a particular fund or specific property under principles of equity." *Landskroner v. Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002, ¶ 34 (8th Dist.), citing *Black's Law Dictionary* 933 (7th Ed.1999). Restatement of the Law, Restitution, Section 161, at 650 (1937) describes an equitable lien as arising when "property of one person can by a proceeding in equity be reached by another as security for a claim on the ground that otherwise the former would be unjustly enriched."

**{¶ 27}** Ohio courts have held that three elements are required to establish an equitable lien: (1) a duty, debt, or obligation, (2) an identifiable res, and (3) an express or implied intent that the property serve as security for the payment of a debt or obligation. *Landskroner* at ¶ 34; *Koon v. Clapp*, 11th Dist. Portage No. 89-P-2101, 1990 Ohio App. LEXIS 4818, *1, 7-8 (Nov. 2, 1990); *Donahoe v. Miller*, 12th Dist. Madison No. CA2005-02-007, 2005-Ohio-7034, ¶ 13. An equitable lien "may arise either from an *express written contract* which shows an intention to charge some particular property with a debt or obligation, *or* may be *implied* and declared by a court of equity on the general considerations of right and justice as applied to relations of the parties and the circumstances of their dealings." (Emphasis sic.) *Koon* at 6, citing *Syring v. Sartorious*, 28 Ohio App.2d 308, 277 N.E.2d 457 (4th Dist.1971).

**{¶ 28}** While the above elements are necessary to establish an equitable lien, they alone are not always dispositive. Courts also take into account traditional equitable considerations, such as whether third parties had notice of the outstanding equitable interest. *See, e.g.*, *Wayne Bldg. & Loan Co. of Wooster v. Yarborough*, 11 Ohio St.2d 195, 200-203, 228 N.E.2d 841 (1967); *Whistler v. Allward*, 57 Ohio

App. 147, 148, 12 N.E.2d 299 (3d Dist.1936) (equitable lien enforceable against third parties with notice); *see also* Restatement of the Law, Restitution, Section 161, at 652. Courts applying equitable remedies also consider the extent to which the party seeking relief has come to court with clean hands, *Hotel Burnet Co. v. Union Cent. Life Ins. Co.*, 72 Ohio App. 453, 458, 52 N.E.2d 754 (1st Dist.1943), whether the party has taken "all reasonable steps to [en]sure that it obtained a perfected lien," *In re McCoy's Waste Industries & Mfg., Inc.*, Bankr.D.D.C. No. 94-00227, 1995 WL 908054, \*1, 26 (Oct. 4, 1995), and other equitable considerations.

{¶ 29} We conclude that the Eighth District misconstrued the separation agreement and erred when it failed to consider the cognovit note, stock-pledge agreement, and UCC financial statement as evidence of the parties' intent to secure only the future obligation. The separation agreement expressly states that Cody had an interest in Ram Sensors and that Karen had relinquished her interest in the business "except that [David] shall secure his obligations by assigning to [Karen] his interest in RAM Sensors, Inc. to secure the payments due to [Karen]. [David] shall execute a Cognovit Note and stock pledge to secure the payments * * *." Approximately ten days after the domestic-relations court entered final judgment in the divorce, David executed the cognovit note for $450,000—the exact amount that David owed Karen for *additional* support beginning in 2034—and Karen and David executed the stock-pledge agreement to secure the note on the same day that David executed the note. The stock-pledge agreement states:

> WHEREAS, pursuant to a Separation Agreement dated on or about the date hereof by and between [David] and [Karen], [David] has acquired from [Karen], and [Karen] has transferred to [David], in exchange for a Promissory Note issued by [David] to [Karen] on or about the date hereof (the "Note"), all right, title and

interest in and to all of [Karen's] equity interest in Ram Sensors Inc., a Sub S Corporation ("RAM"), consisting of a one-half (1/2) interest therein; and

WHEREAS, to secure payment under the Note, [David] is pledging his entire interest to [Karen] upon the terms and conditions set forth in this Agreement.

(Underlining sic.)

**{¶ 30}** Moreover, approximately 20 months later—when David and Cody's case had been pending in the general division of the common pleas court for nearly 10 months—Karen filed the UCC financing statement. R.C. 1309.502(A) sets forth the required "[c]ontents of [a] financing statement," which are the name of the debtor, the name of the secured party, and the collateral covered by the financing statement. The official comment under that section states: "This section adopts the system of 'notice filling, [which] indicates merely that a person may have a security interest in the collateral indicated." Official Comment 2 to R.C. 1309.502. "The function of a financing statement is to give notice to interested third parties that the person filing it may have a security interest in property of the debtor named therein." *Natl. Bank of Fulton Cty. v. Haupricht Bros., Inc.*, 55 Ohio App.3d 249, 255, 564 N.E.2d 101 (6th Dist.1988) ("[P]erfection by filing a financing statement is predicated on notice. So long as the financing statement apprises a record searcher that certain collateral may be encumbered by a security interest, then such security interest continues perfected"), citing Official Comment to R.C. 1309.39.

**{¶ 31}** The judge dissenting in part from the Eighth District majority opinion stated, "If Karen believed herself entitled to a [nearly] $4 million lien against David's shares of RAM Sensors based on the terms of the separation agreement, the U.C.C. Statement would have been the mechanism to secure her rights, not the seeking of an equitable lien in excess of that which she claimed in

14

the U.C.C. Statement." *Id*. at ¶ 70 (Sean S. Gallagher, J., concurring in part and dissenting in part), citing *McCoy's*, 1995 WL 908054, at *26 (allowing the use of an equitable lien would defeat the policy behind the UCC financing statement of assuring notice to the public of the extent of the creditor's lien). We agree. Further, if Karen believed that the Ram Sensors stock secured both of David's support obligations, she could have filed a contempt motion in her and David's divorce case in the domestic-relations court immediately following David's execution of the cognovit note, which occurred approximately ten days after the final divorce decree was entered. Significantly, David promised in the cognovit note to pay Karen $450,000—*considerably less than $4.05 million*. Cody, well aware of his parents' divorce and settlement agreement, accepted his father's stock shares *subject to his mother's perfected lien*—a lien that she notified third-party creditors existed through the UCC financing statement.

{¶ 32} Although the first two elements of an equitable lien are present in this case (an obligation—David's obligation to pay $3.6 million in current spousal support, and the identifiable res—David's Ram Sensors stock), there is no express or implied intent here for the Ram Sensors stock to serve as security for David's current obligation to pay the 240 monthly payments totaling $3.6 million. *See Landskroner*, 154 Ohio App.3d 471, 2003-Ohio-4945, 797 N.E.2d 1002, at ¶ 34. "[O]ne of the fundamental maxims of equity is, 'Equity regards as done that which ought to be done.' " *Klaustermeyer v. Cleveland Trust Co*., 89 Ohio St. 142, 147, 105 N.E. 278 (1913), quoting 16 Cyc. 135.

{¶ 33} Although we agree with Cody that the Eighth District misconstrued the separation agreement and erred when it recognized an equitable lien securing David's current support obligation, we decline to adopt a bright-line rule that there can never be an equitable lien when a UCC financing statement has been filed. "Claims for equitable relief typically require the trial court to balance the equities of the parties" based on the facts of each case. *Blue View Corp. v. Rhynes*, 9th Dist.

Summit No. 23034, 2006-Ohio-4084, ¶ 14, citing *River Terrace Condominium Assn. v. Lewis*, 33 Ohio App.3d 52, 56, 514 N.E.2d 732 (1st Dist.1986). We therefore do not adopt Cody's first proposition of law. We agree, however, with Cody's second proposition of law that equitable liens should be recognized only after balancing the competing interests of the parties as well as third-party creditors and public interests, and therefore adopt it.

### III. CONCLUSION

{¶ 34} For the reasons stated in this opinion, we conclude that the Eighth District erred when it determined that Karen held an equitable lien on David's Ram Sensors stock shares securing David's current obligation to pay monthly spousal support to Karen.

Judgment reversed.

O'CONNOR, C.J., and DeWINE, DONNELLY, and BRUNNER, JJ., concur.

KENNEDY, J., concurs in judgment only, with an opinion joined by FISCHER, J.

_____

**KENNEDY, J., concurring in judgment only.**

{¶ 35} I concur in the majority's decision today to reverse the judgment of the Eighth District Court of Appeals affirming the trial court's imposition of an equitable lien to secure $3.6 million in spousal support. I disagree with the majority, however, to the extent that it suggests that an equitable lien could ever be created in combination with a separate lien evidenced by the filing of a Uniform Commercial Code ("UCC") financing statement. Consequently, I concur in the majority's judgment but not in its reasoning and analysis.

### Facts and Procedural History

{¶ 36} I agree with the statement of facts recited by the majority, but I highlight the following facts. As part of their separation agreement incorporated into a divorce decree, appellee David Miller promised to pay appellee Karen

Michael $3.6 million over 20 years, followed by the payment of $450,000 over the next 6 years. David agreed to secure these obligations with a cognovit note and to enter into an agreement to pledge his shares of stock in Ram Sensors, Inc., as collateral. After the divorce was finalized, David executed a cognovit note in the amount of $450,000 along with a stock-pledge agreement. Karen later filed a UCC financing statement indicating that she had a lien on David's shares of Ram Sensors stock by virtue of the stock-pledge agreement, putting the world on notice that she had a lien on the stock securing David's six-year obligation to pay $450,000 in spousal support. Approximately four years after the divorce had been finalized, Karen filed a postdecree pleading in the divorce case seeking a declaration that the stock secured both of David's support obligations, for a total amount greater than $4 million. The trial court determined that the parties had intended for the stock to secure this entire amount, not just $450,000, and it imposed an equitable lien on the stock to secure David's 20-year obligation to pay $3.6 million. The court of appeals affirmed.

**Law and Analysis**

{¶ 37} In enacting R.C. Chapter 1309, the General Assembly created a statutory remedy to enforce secured transactions. *See, e.g.*, R.C. 1309.607. The purposes and policies of the UCC are to "simplify, clarify, and modernize the law governing commercial transactions," R.C. 1301.103(A)(1), to promote the continued expansion of commercial practices, R.C. 1301.103(A)(2), and to make the law among the various jurisdictions uniform, R.C. 1301.103(A)(3). Because the UCC is a creature of statute, other principles of law and equity do not apply if they are displaced by a provision of the UCC, *see* R.C. 1301.103(B), or if they are inconsistent with its purposes and policies, R.C. 1301.103, Official Comment 2; White, Summers, & Hillman, 1 *Uniform Commercial Code*, Section 1:2, 3-4 (6th Ed.2020). "[W]hile principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its

provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise." (Emphasis sic.) R.C. 1301.103, Official Comment 2.

{¶ 38} In addition to preempting displaced or inconsistent law, the UCC advances its purposes and policies by providing in most cases for the centralized filing of financing statements with the secretary of state. R.C. 1309.501(A)(2). Replacing the recording of security interests locally with a single statewide location for filing financing statements has been described as a "major innovation" of the UCC, allowing parties to determine in one place whether a security interest has been created and perfected. 4 White & Summers, *Uniform Commercial Code*, Section 31:27, 239. This helps eliminate the risk that a creditor will be unprotected because of a mistake in filing notice of a security interest in the wrong place or using the wrong document. *Id.* at 247. It also helps ensure that security interests are discovered without requiring the search of records in multiple localities.

{¶ 39} The General Assembly created a legal remedy for a party to perfect a security interest and to have priority over other parties who subsequently perfect their security interest. *See* R.C. 1309.308(A) and 1309.322. Karen had the opportunity to use, and did use, the UCC's provisions to secure the collateral for David's support obligations, but she failed to file a UCC financing statement to protect and have priority over the collateral in the entire $4.05 million amount he owed her. *See* R.C. 1309.201(A), 1309.312(A), 1309.317(A)(2)(a), and 1309.501 et seq. Karen chose to avail herself of the law to the extent that she did, but when she filed her UCC financing statement, the stock-pledge agreement provided that David's shares of stock were collateral securing only $450,000 in future spousal support. She therefore gave notice to the world only that she had a lien on David's stock in the amount of $450,000. Because she chose to protect her security interest using the UCC, her priority over other creditors and transferees is limited to what

she filed under the UCC, leaving any security interest in the $3.6 million in current spousal support unprotected.

{¶ 40} Because Karen filed a UCC financing statement in order to secure a $450,000 lien, she cannot seek an equitable lien in an amount greater than the one she announced in her financing statement. Equitable liens are imposed when, "[i]n a transaction founded on contract, express or implied, there being no adequate remedy at law for its breach, equity will presume the parties to have done what, under the contract and in good conscience, they should have done." *Klaustermeyer v. Cleveland Trust Co.*, 89 Ohio St. 142, 105 N.E. 278 (1913), paragraph one of the syllabus. But equitable relief is "a supplemental system, designed and administered for the purpose of supplying the deficiencies of the law," and therefore, "equity will intervene only when legal remedies are inadequate." *Salem Iron Co. v. Hyland*, 74 Ohio St. 160, 166, 77 N.E. 751 (1906),

{¶ 41} Karen had an adequate remedy at law. She negotiated a stock-pledge agreement that made David's shares of stock collateral securing the payment of spousal support, and the law permitted her to protect that security interest against subsequent creditors and transferees by filing a financing statement with the secretary of state. *See* R.C. 1309.310(A) and 1309.312(A). Karen could have ensured that the stock-pledge agreement and the financing statement encompassed the entire amount of spousal support that David owed her, but she did not. The fact that she failed to take advantage of a remedy at law does not make that remedy inadequate. "[E]quity aids the vigilant, not those who slumber on their rights." *Harris v. Wallace Mfg. Co.*, 84 Ohio St. 104, 108, 95 N.E. 559 (1911). "Simply ignoring legal remedies does not open the door to equitable relief." *Guild Mtge. Co. v. Prestwick Court Trust*, 293 F.Supp.3d 1228, 1235 (D.Nev.2018). Therefore, there is no authority for Karen to use equity to go back and broaden what she filed under the UCC and protect a greater amount of interest in the collateral than she did.

**{¶ 42}** Moreover, a court should not grant equitable relief without considering where the public interest lies. *Sanders v. Mountain Am. Fed. Credit Union*, 689 F.3d 1138, 1144 (10th Cir.2012). Allowing equity to intervene in these circumstances would thwart the public policy the General Assembly codified in providing statutory rules governing secured transactions. Those rules determine when a security agreement is enforceable between the parties and against purchasers of the collateral and creditors. *See* R.C. 1309.201(A). They establish how and to what extent a secured party may enforce a security interest against collateral. *See* R.C. 1309.607. The rules also provide for centralized filing of financing statements, eliminating the need for a party to search the court records of every county in a state to determine whether an interest in collateral is the subject of an equitable lien. *See* R.C. 1309.501(A)(2) Lastly, the rules ensure that a person who gives value for the collateral without notice of the security interest takes it free and clear of the security interest. *See* R.C. 1309.317.

**{¶ 43}** Allowing a court to impose an equitable lien on collateral that is the subject of a UCC financing statement will undermine these statutory rules and potentially allow a lien to continue when it would be extinguished by operation of the statute. For this reason, I would adopt a bright-line rule that an equitable lien cannot attach to collateral subject to a secured transaction under R.C. Chapter 1309.

**{¶ 44}** Consequently, I concur only in the majority's judgment reversing the court of appeals' imposition of an equitable lien under these circumstances.

FISCHER, J., concurs in the foregoing opinion.

_____

John V. Heutsche Co., L.P.A., and John V. Heutsche, for appellee Karen Miller.

Weston Hurd, L.L.P., and Scott J. Orille, for appellant.

_____