[Cite as *Brook Park v. Cleveland*, 2023-Ohio-3365.]

COURT OF APPEALS OF OHIO

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

CITY OF BROOK PARK,                    :

    Plaintiff-Appellant,           :               No. 112368

v.                                     :

CITY OF CLEVELAND,                     :

    Defendant-Appellee.            :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:** REVERSED AND REMANDED
**RELEASED AND JOURNALIZED:** September 21, 2023

---

Civil Appeal from the Cuyahoga County Common Pleas Court
Case No. CV-17-890610

---

*Appearances:*

Ulmer & Berne LLP, Steven S. Kaufman, Robin M. Wilson, Chad D. Cooper, and David D. Yeagley; and Carol D. Horvath, Director of Law, City of Brook Park, *for appellant*.

Mark D. Griffin, Cleveland Director of Law, and Elena N. Boop and Gilbert E. Blomgren, Assistant Law Directors, *for appellee*.

MICHELLE J. SHEEHAN, J.:

{¶ 1} Plaintiff-appellant, city of Brook Park ("Brook Park"), appeals from the trial court's decision granting summary judgment in favor of defendant-appellee, city of Cleveland ("Cleveland"). Cleveland had planned to expand the Cleveland Hopkins Airport ("the Airport") and to build a third runway. The two cities entered into an agreement in 2001 for Cleveland to purchase residential properties located where the third runway was to be built. The two cities agreed to an acquisition program whereby Cleveland would purchase the affected residential properties in phases. The runway was never built and in 2007 Cleveland unilaterally halted the program.

{¶ 2} In 2017, Brook Park filed the instant lawsuit against Cleveland, asserting that Cleveland breached the parties' agreement and sought specific performance by Cleveland in accordance with their agreement. Cleveland acknowledges its breach of the terms of the agreement but claims that Brook Park lacks standing to bring the lawsuit and that the lawsuit is barred by the statute of limitations and the doctrine of laches. Cleveland also claims the relief of specific performance sought by Brook Park is inequitable. Both Cleveland and Brook Park moved for summary judgment. Without any explanations, the trial court granted Cleveland's motion for summary judgment. Having reviewed the record and applicable law, we conclude summary judgment in favor of Cleveland is not properly granted because genuine issues of material fact remain for determination in this

case. We therefore reverse the trial court's decision and remand the matter for further proceedings consistent with this opinion.

**BACKGROUND**

{¶ 3} As Brook Park alleges, throughout the 1990's, Cleveland and Brook Park had multiple disputes over land use and development around the Airport, as well as the ownership of the International Exposition Center ("IX Center"), which is adjacent to the airport. In 1999, Cleveland planned to expand the Airport to accommodate an expected increased volume of international air travel. The planned expansion included the construction of a third runway over a residential neighborhood in Brook Park, and it would require the elimination of over 300 residential properties. Around the same time, Cleveland and Brook Park were engaged in litigation involving the IX Center in *Brook Park v. Brook Park Community Urban Redevelopment Corp.*, Cuyahoga C.P. No. 99 ADV 15039.

{¶ 4} The litigation resulted in a settlement; Brook Park and Cleveland entered into a "Settlement Agreement" ("the Agreement") on September 6, 2001, to resolve their dispute over the IX Center and to provide a program for Cleveland to acquire the residential properties in Brook Park for its airport expansion. Brook Park entered into the Agreement pursuant to the authority of Ordinance No. 8783-

2001, and Cleveland entered into the Agreement pursuant to the authority of Ordinance No. 624-01.[1]

## A. The Settlement Agreement and the Residential Acquisition Program

{¶ 5} Pursuant to the Agreement, Brook Park agreed to end its litigation against Cleveland regarding Brook Park's claim to the IX Center. Cleveland agreed to purchase over 300 residential properties affected by the planned construction of the new runway. Article 9 of the Agreement is titled "Residential Acquisition Program" ("RAP") and it sets forth a mechanism for Cleveland to purchase the residential properties required for the construction of the runway in lieu of instituting eminent domain proceedings for these properties. According to Brook Park, the RAP "provide[s] a means by which Brook Park and its citizens would avoid uncontrolled, non-time specific, costly and piecemeal neighborhood elimination through Cleveland's use of eminent domain."

{¶ 6} Section 9.1 states:

To provide for the orderly acquisition of property in the Expansion Zone, balancing the stability of the existing neighborhood against the

---

[1] The first paragraph of the Agreement states:

This Settlement Agreement (this "Agreement") is made this 6th day of September, 2001, between the CITY OF BROOK PARK, OHIO ("Brook Park"), acting pursuant to the authority of Ordinance No. 8783-2001, approved by the electors of Brook Park on August 7, 2001 * * * and the CITY OF CLEVELAND, OHIO ("Cleveland"), acting pursuant to the authority of Ordinance No. 624-01, passed July 19, 2001 * * * both of which are municipal corporations organized and existing under Section XVII of the Ohio Constitution.

need to accommodate any future Airport Expansion, the parties hereby establish a Residential Acquisition Program to create the option for owners of residence to sell their property to Cleveland as described below. * * * Subject to the provisions of Section 9 of this Agreement, Cleveland will acquire all residences (not including apartments) whose owners elect to participate in the Residential Acquisition Program.

{¶ 7} The Agreement provides that the RAP will be carried out in two phases. Residences located in the planned runway are classified as Phase I, which are divided into Zones 1 through 6. Cleveland's acquisition of the properties located in Phase I is mandatory and, under Section 9.2.1, the owners of all residences in Phase I are eligible to participate in the RAP. Cleveland is required to acquire Phase I properties in sequence from Zone 1 to Zone 6. Phase II is optional; under Section 9.2.2, Cleveland has the option, in its own discretion, to carry out Phase II of the RAP.

{¶ 8} As to the procedure of Cleveland's acquisition of the eligible properties, under Section 9.5, eligible property owners may elect to sell their property by submitting to Cleveland an executed Election Agreement, which constitutes a binding contract between the property owner and Cleveland. Pursuant to Section 9.9.1, after a property owner submits an Election Agreement, Cleveland is required to acquire the property for a fair market price determined by an appraiser in accordance with the procedure set forth in the RAP.

{¶ 9} Brook Park maintains that the acquisition of the properties by Cleveland by the RAP provides significant benefits to Cleveland as well as valuable

protections to the affected homeowners: for Cleveland, a piecemeal eminent domain process in court would drastically escalate its acquisition costs for the properties; for the homeowners, the RAP provides a predictable, orderly procedure to sell their properties to Cleveland.

## B. Post Agreement: Cleveland's Breach of the Agreement

{¶ 10} In February 2002, Cleveland commenced the RAP and soon began to receive Election Agreements from the eligible homeowners. Almost all property owners in Phase 1, including Zones 5 and 6, elected to participate in RAP and submitted executed Election Agreements.

{¶ 11} In May 2003, Cleveland defaulted in its performance of the RAP. On June 27, 2003, Mayor Jane Campbell of Cleveland sent a letter to Mayor Mark Elliott of Brook Park. The letter stated that the circumstances had changed regarding the expansion of the Airport due to unforeseen events beyond Cleveland's control, such as the terrorist attack on the World Trade Center on September 11, 2001; the Afghanistan war; a distressed economy; and the outbreak of SARS. The letter stated that, as a result, Cleveland would be unable to issue purchase offers to 22 eligible condominium owners and seven eligible homeowners in Zone 1.

{¶ 12} Several days later, on July 1, 2003, Brook Park's Director of Law responded to Cleveland in a letter, expressing his disagreement with Cleveland regarding the alleged changed circumstances and declaring Cleveland in breach of

the Agreement. Brook Park then followed the dispute resolution procedure set forth in the Agreement.

{¶ 13} In early 2004, Cleveland restarted the RAP. From 2004 through 2007, it purchased 253 homes in Zone 1 through Zone 4 of Phase I; all but one homeowner in these zones elected to participate in the program. Cleveland demolished all of the homes it acquired in accordance with the Agreement.

{¶ 14} Many property owners in Zones 5 and 6 also submitted Election Agreements prior to the election deadline of April 2007. Cleveland, however, announced in May 2007 through a press release that it would not purchase homes in the remaining two zones in Phase I (Zone 5 and 6). Cleveland stated in the press release that "[t]he original funding obligation has been allocated in its entirely, and we can't afford to purchase the remaining two zones in Phase I of the Residential Acquisition Program." Cleveland's press release quoted Mayor Elliott of Brook Park as stating "[w]e wanted the residents to know their fate without delay so they can get on with their lives knowing their homes will not be purchased." The press released also stated that the homes remaining in Zones 5 and 6 of Phase I would now be moved into Phase II.

{¶ 15} A year later, Mayor Elliott of Brook Park and Ricky Smith, the Director of Cleveland's Department of Port Control, signed on May 28, 2008, and June 12, 2008, respectively, a "Memorandum of Understanding Regarding Phase I of the Residential Acquisition Program of the 2001 Settlement Agreement"

("MOU"). The parties expressed an agreement to move Zones 5 and 6 properties from the mandatory Phase I to the optional Phase II. The MOU states furthermore that "[t]he order of acquisition of Zones 5 & 6 in Phase II will be determined once the Airport Master Plan update is completed. Cleveland's 7-year option window for Phase II will start on April 27, 2009 per the current Settlement."

{¶ 16} On August 12, 2008, Mayor Elliott of Brook Park sent a letter to the residents. The letter stated:

> The City of Brook Park and the Cleveland Hopkins Airport finalized an agreement that will end Phase I of the Acquisition Program through Zone 4 on April 26, 2009 per the current Settlement Agreement. Homes in Zones 5 and 6 will be moved to Phase II to protect them under the umbrella of the Settlement Agreement should Cleveland decide to move forward with Phase II. Cleveland's seven-year option window for Phase II will start on April 27, 2009 — the same timeline as in the original agreement."

{¶ 17} While Cleveland claims that this letter is a notification to Brook Park's residents that the terms of the Agreement and RAP are no longer in effect, the letter on its face appears to be restating Cleveland's option under the Agreement to exercise its option for Phase II through April 27, 2016.

{¶ 18} On July 18, 2016, several months after the expiration of Cleveland's option for Phase II acquisition on April 27, 2016, Law Director of Brook Park Carol Horvath sent a letter to Mayor Frank Jackson of Cleveland, advising Cleveland that it was in default of the Agreement. Brook Park asserted that the terms of the Agreement have never been lawfully modified and many homeowners in Zones 5

and 6 had timely submitted Election Agreements yet Cleveland preemptively announced that it would no longer participate in the RAP regarding Zones 5 and 6. The letter stated that

> [s]ince that time, the homeowners in Zones 5 and 6 have lived in limbo. Because Cleveland still retained an option — through April 26 — to purchase homes in Phase II, the homeowners waited until this past April in the hopes that Cleveland would exercise its option and include Zones 5 and 6 within that option exercise. Cleveland did not.

Brook Park demanded that Cleveland complete the acquisition of the properties located in Zone I and to also reopen the time period for the remaining Zones 5 and 6 owners who have not submitted Election Agreements.

{¶ 19} On August 8, 2016, Cleveland responded to Brook Park's demand. Cleveland asserted that Zones 5 and 6 in Phase I have become part of Phase II under the 2008 MOU and, in April of 2016, Cleveland declined its option to enter into Phase II of the RAP. Cleveland asserted that it was not in default because it was not under an obligation to purchase homes in Zone 5 and Zone 6. Cleveland claimed the MOU was validly executed pursuant to governmental consent of both cities. We note, however, Cleveland no longer maintains this position. It admits during the instant litigation that the MOU is void and unenforceable.

## C. The Instant Lawsuit

{¶ 20} On December 19, 2017, Brook Park filed the instant complaint claiming Cleveland breached the Agreement and seeking specific performance pursuant to the provisions of the Agreement. The complaint alleged three counts:

breach of the Agreement (Count 1), breach of the Election Agreements (Count 2), and declaratory judgment (Count 3) concerning the MOU.

{¶ 21} Specifically, in Count 1, Brook Park alleges Cleveland breached the Agreement in failing to purchase the homes in Zones 5 and 6 whose owners have elected to have Cleveland purchase their properties pursuant to the provisions of the RAP. In Count 2, Brook Park alleged Cleveland breached the Election Agreements submitted by these homeowners. In Count 3, Brook Park alleges that the MOU is void because Section 12.2 of the Agreement provides that the Agreement may only be modified by a written instrument executed pursuant to the governmental consent of both Brook Park and Cleveland, yet the MOU was not executed with governmental consent and furthermore does not adhere to Brook Park and Cleveland ordinances. Brook Park seeks a declaration that the MOU is void.

**D. Cleveland's Motion for Summary Judgment**

{¶ 22} Cleveland and Brook Park filed competing motions for summary judgment. In its motion for summary judgment, Cleveland raises five defenses to the breach-of-contract claim. First, it claims that Brook Park has no standing to seek the enforcement of the Agreement because it is not a "real party in interest" as Brook Park does not own any properties at issue. Cleveland claims Brook Park has no stake in its attempt to compel the enforcement of the RAP.

{¶ 23} Second, Cleveland claims that the remedy of specific performance is governed by equitable principles and such a remedy would be inequitable in this

case because completing Phase I of the RAP would force Cleveland to incur unbudgeted and unavailable funds for a public purpose that no longer exists.

{¶ 24} Third, Cleveland claims this case should be governed by the four-year statute of limitations set forth in R.C. 2305.09(E). That statute governs the time limitation for relief sought on the grounds of a physical or regulatory taking of real property. Cleveland asserts that "the Agreement and the RAP provide a framework for physical takings of real estate (appropriations) by the City as a municipal corporation" and, therefore, should be governed by the 4-year statute of limitations. Cleveland maintains that the breach of contract occurred on June 27, 2003 (when Mayor Campbell sent a letter advising Brook Park that Cleveland would not comply with the Agreement) or, at the latest, August 12, 2008, when Brook Park sent a letter to its residents advising them Cleveland would not purchase Zones 5 and 6 properties.

{¶ 25} Fourth, Cleveland argues Brook Park's breach-of-contract claim is barred by the doctrine of laches. It alleges Brook Park waited 13 and a half years from the time it knew of Cleveland's breach (June 27, 2003) to bring the instant lawsuit and the delay prejudiced Cleveland.

{¶ 26} Fifth, Cleveland argues that Brook Park's complaint is also barred by the doctrine of impossibility. Cleveland alleges the purpose of the Agreement — to build a third runway for the Airport — no longer exists due to events beyond Cleveland's control, which obviated the once-perceived need to construct a third

runway. We note that, on appeal, Cleveland no longer asserts the impossibility defense.

{¶ 27} Regarding Count 3 (Brook Park's request for a declaration that the MOU is void and unenforceable), Cleveland admits that the MOU is void and unenforceable in its responses to Brook Park's requests for admission and interrogatories. Consequently, Cleveland is silent regarding Count 3 and does not mention the MOU in its motion for summary judgment; Cleveland appears to have reversed its earlier position that the MOU modified the Agreement.[2]

### E. Brook Park's Motion for Summary Judgment

{¶ 28} Brook Park filed a combined motion for summary judgment and opposition to Cleveland's motion for summary judgment. Brook Park claims that (1) Cleveland admitted that it breached the terms of the Agreement; (2) Brook Park, as a party to the Agreement, had standing to enforce the provisions of the Agreement and the Election Agreements; (3) the remedy of specific performance is provided in the Agreement and, furthermore, the equities weigh in favor of Brook Park; (4) Brook Park's complaint is not time-barred because it is an action in contract and the complaint was filed within the statutory time for a contract action; (5) Brook

---

[2] The trial court's decision granted summary judgment in favor of Cleveland without specifically mentioning Count 3, which seeks a declaration that the MOU is void and unenforceable. Brook Park asserts that the trial court's decision is final and appealable despite a lack of declaration sought in Count 3 because Cleveland has admitted the MOU was void and enforceable. We agree. Cleveland's admission renders the declaratory judgment issue moot, and the trial court was no longer required to consider it.

Park had reasonably believed that it was required to wait until the expiration of Cleveland's option for Phase II in April 2016 to file the lawsuit and, therefore, its complaint is not barred by laches; and (6) Cleveland's performance under the contract is not excused by impossibility. Brook Park alleges that Cleveland's termination of the acquisition program severely damaged a once vibrant neighborhood, with Zones 5 and 6 properties now situated next to abandoned land, leaving homeowners without recourse.

**APPEAL**

{¶ 29} Without explanations, the trial court granted summary judgment in favor of Cleveland. Brook Park now appeals, raising the following assignments of error for our review:

I. The trial court erred by improperly granting the Motion for Summary Judgment filed by the City of Cleveland.

II. The trial court erred by entering a final judgment and by failing to grant the Motion for Summary Judgment filed by the City of Brook Park.

For ease of discussion, we address the two assignments jointly.

**A. Summary Judgment Standard**

{¶ 30} Summary judgment is appropriate where it appears that (1) there is no genuine issue as to any material fact; (2) the moving party is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary

judgment is made, who is entitled to have the evidence construed most strongly in his favor. *Harless v. Willis Day Warehousing Co., Inc.*, 54 Ohio St.2d 64, 66, 375 N.E.2d 46 (1978). Pursuant to Civ.R. 56(C), summary judgment shall be rendered if "the pleadings, depositions, answers to interrogatories, written admissions, affidavits, transcripts of evidence, and written stipulations of fact, if any, timely filed in the action, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." We review a trial court's grant of summary judgment de novo. *Grafton v. Ohio Edison Co.*, 77 Ohio St.3d 102, 105, 671 N.E.2d 241 (1996).

{¶ 31} In its motion, Cleveland claims summary judgment in its favor is warranted on several grounds. Because the trial court summarily granted Cleveland's motion, it is unclear on which ground(s) the trial court's judgment is based. In the following, we address in turn each ground raised by Cleveland.

**B. Standing**

{¶ 32} While Brook Park's complaint is based on the 2001 contract between the two cities, Cleveland claims Brook Park lacks standing to file the instant complaint, claiming Brook Park has no stake in the outcome of the case because Brook Park does not own the subject properties.

{¶ 33} Standing is defined as "'[a] party's right to make a legal claim or seek judicial enforcement of a duty or right.'" *Ohio Pyro, Inc. v. Ohio Dept. of Commerce*, 115 Ohio St.3d 375, 2007-Ohio-5024, 875 N.E.2d 550, ¶ 27, quoting Black's Law

Dictionary 1442 (8th Ed.2004). Under Ohio law, "a contracting party has standing to prosecute an action for breach of contract." S*utherland v. Gaylor*, 10th Dist. Franklin No. 20AP-257, 2021-Ohio-1941, ¶ 24. *See also Grant Thornton v. Windsor House, Inc.*, 57 Ohio St.3d 158, 161, 566 N.E.2d 1220 (1991) (In order to bring a breach of contract claim, one must be a party to the contract or have some other legal standing to enforce it such as a third-party beneficiary); *Hey v. Cummer*, 89 Ohio App. 104, 131, 97 N.E.2d 702 (8th Dist.1950) (as a broad general rule, only a party or one in privity may enforce a contract). As a contracting party, Brook Park has standing to bring a breach-of-contract claim against Cleveland.

{¶ 34} Moreover, the terms of the Agreement specifically permit the non-breaching party to seek relief in court. Section 11.1 states that the non-breaching party "is entitled to injunctive relief compelling the specific performance of those obligations under this Agreement." Section 11.2 authorizes each party to the Agreement to "enforce the performance and observance of any obligation of either party."

{¶ 35} Brook Park, as a contracting party to the Agreement, has standing to enforce it, and moreover, the provisions of the Agreement expressly provide for the non-breaching party's standing to sue. Accordingly, summary judgment predicated on Brook Park's lack of standing would be improper.

## C. Statute of Limitations

{¶ 36} The instant complaint alleges that Cleveland breached the parties' 2001 Agreement. Yet, Cleveland argues the complaint should be construed as one seeking a court order compelling Cleveland 's exercise of its eminent domain power pursuant to Chapter 163 of the Revised Code, which governs a governmental entity's appropriation of private property. Cleveland therefore claims that the complaint is barred by a four-year-statute of limitations for such a claim, citing *State ex rel. Nickoli v. Erie Metroparks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588 (an action for relief on the grounds of a physical or regulatory taking of real property must be brought within four years after the cause accrues).

{¶ 37} Brook Park asserts that the instant action is based on a written contract, rather than on Cleveland's eminent domain power, and, therefore, the statute of limitations for a written contract applies. We agree.

{¶ 38} Our review of the 2001 Agreement indicates that the parties contracted for Cleveland to *purchase* the subject properties for the anticipated new runway under the terms of the RAP *in lieu of Cleveland's exercise of its eminent domain power.* Section 9.1 states that the RAP is established to create the option for homeowners to sell their property to Cleveland. Section 9.14, headed "Exclusive Method of Residence Acquisition," provides that the RAP "shall be the exclusive method for Cleveland to acquire residences in the area covered by the applicable Phase." There is an exception to the exclusive method, however, when a resident

elects not to participate in the RAP. In that event, Cleveland may initiate eminent domain proceedings, but such a resident is permitted to subsequently elect to participate in the RAP "in lieu of eminent domain." Section 9.14. This section also states that "[n]othing in this Article shall prohibit Cleveland from acquiring property located in each Phase by negotiation or eminent domain after the term of the applicable Phase [expires]." It is evident from these contractual provisions that the parties have contracted for Cleveland's purchase of the subject properties under the terms of the RAP (but allow for Cleveland's exercise of its eminent domain power when a homeowner elects not to participate in the RAP or when the RAP expires).

{¶ 39} Brook Park's claim that this case should be construed as an action predicated on Cleveland's eminent domain power – and therefore limited by a four-year statutory time — is not supported by our review of the provisions contained in the Agreement. Rather, Brook Park's claim is based on Cleveland's breach of the terms of a written contract between the two parties. As such, the statute of limitations for a written contract applies in this case.

{¶ 40} Cleveland does not dispute that it breached the terms of the 2001 Agreement in not completing the purchase of the Phase I properties. The question is when Cleveland's breach occurred for purposes of the statute of limitations. Brook Park claims the breach occurred in April 2016 when Cleveland declined to exercise its option for Phase II.

{¶ 41} Brook Park's claim is not supported by the record because, while properties in Zones 5 and 6 of Phase I are moved into Phase II under the MOU, Brook Park maintains, and Cleveland admits, that the MOU is void. In the absence of the MOU, Zones 5 and 6 are part of Phase I and Cleveland was in breach in May 2007 when Cleveland announced publicly that it would not purchase homes in Zones 5 and 6 of Phase I, citing a lack of budget. Cleveland's press release quoted Mayor Elliott of Brook Park as stating that the affected residents "deserve to know their fate without delay so that they can get on with their lives knowing their homes will not be purchased."

{¶ 42} Pertinent to this appeal, R.C. 2305.06, which governs the statute of limitations for a written contract, was amended by S.B. 224, effective September 28, 2012, which changed the statute of limitations for a written contract from 15 years to 8 years. For claims that accrued *prior to* September 28, 2012, the effective date of S.B. 224, the statute of limitations is the lesser of 15 years from the date of accrual or 8 years from September 28, 2012. *See e.g.*, *Agrawal v. Univ. of Cincinnati*, 10th Dist. Franklin No. 16AP-293, 2017-Ohio-8644, ¶ 12. Pursuant to the amendment, therefore, the statute of limitations for the instant contract claim, which accrued in May 2007, would be September 28, 2020. Brook Park filed the complaint on December 19, 2017, within the applicable statute of limitations. Consequently, summary judgment in favor of Cleveland cannot be granted on this ground.

**D. Specific performance**

{¶ 43} Section 11.1 of the Agreement states that "[t]he parties acknowledge and agree that * * * the party that has not breached this Agreement is entitled to injunctive relief compelling the specific performance of those obligations under this Agreement." Despite the express provision for the remedy of specific performance in the event of a breach, Cleveland maintains that specific performance is an equitable remedy and it is inequitable for the court to order specific performance under the circumstances of this case.

{¶ 44} Generally, "specific performance as a remedy for breach of contract is a matter resting in the sound discretion of the court, not arbitrary, but controlled by principles of equity, on full consideration of the circumstances of each particular case." *Krueger v. Swineford*, 2015-Ohio-3518, 41 N.E.3d 807, ¶ 14 (6th Dist.) (while the contract provided for the specific performance of a right of first refusal, the trial court did not err in finding the right of first refusal too vague or uncertain to be enforceable). "Equity arose to make exceptions when rules of law would work injustice in particular cases or to deal with some novel situation not covered by rules of law." *ZF Micro Solutions, Inc. v. TAT Capital Partners, Ltd.*, 82 Cal. App.5th 992, 1000, 298 Cal. Rptr.3d 385 (4th Dist.2022).

{¶ 45} While Section 11.5 of the Agreement states that "[t]he parties further acknowledge that changes in law, regulation or policy, or changes in circumstances shall not forgive compliance with the terms of this Agreement," Cleveland alleges

that "forcing Cleveland to purchase multiple parcels of residential real estate at undeterminable cost to its taxpayers would be oppressive to Cleveland in the extreme" especially in light of the fact that the third runaway project was cancelled many years ago.

{¶ 46} Cleveland's claim that equities require a grant of summary judgment in its favor appears to be based on mere allegations and not supported by evidence existing in the record before the trial court.[3] "'Claims for equitable relief typically require the trial court to balance the equities of the parties' based on the facts of each case." *Michael v. Miller*, Slip Opinion No. 2022-Ohio-4543, ¶ 33, quoting *Blue View Corp. v. Rhynes*, 9th Dist. Summit No. 23034, 2006-Ohio-4084, ¶ 14. "Balancing of equities involves a weighing of the evidence, which is inappropriate on summary judgment." *Blue View*, *supra* at ¶ 14. Accordingly, because issues of fact remain at this stage of the proceedings, summary judgment based on Cleveland's claim that an order of specific performance for Cleveland's breach is inequitable would be improper.

---

[3] For example, while Cleveland has maintained that the plan for the third runway no longer exists, Brook Park cites a recent announcement by Cleveland that the city has just hired a new Director of Port Control, who will "jump start our $2 billion, 20-year master plan to transform Cleveland Hopkins into a world-class airport for our city and the region." In addition, Brook Park alleges that subsequent changes in business climate does not obviate the purpose underlying the Agreement because Cleveland could still use the acquired land for other Airport purposes unrelated to the third runway. Thus, it appears issues of fact exist at this juncture.

### E. Laches

**{¶ 47}** In addition to asserting the statute-of- imitations defense, Cleveland claims the doctrine of laches bars Brook Park's lawsuit. "Laches is an equitable doctrine that has been defined as 'an omission to assert a right for an unreasonable and unexplained length of time, under circumstances prejudicial to the adverse party.'" *Sims v. Anderson*, 2015-Ohio-2727, 38 N.E.3d 1123 (4th Dist.), ¶ 20, quoting *Connin v. Bailey*, 15 Ohio St.3d 34, 35, 472 N.E.2d 328 (1984). The party invoking laches must establish by a preponderance of the evidence the following elements: "(1) unreasonable delay or lapse of time in asserting a right; (2) absence of an excuse for the delay; (3) knowledge, actual or constructive, of the injury or wrong; and (4) prejudice to the other party." *Id.,* citing *State ex rel. Meyers v. Columbus*, 71 Ohio St.3d 603, 605, 646 N.E.2d 173 (1995). Furthermore, "[d]elay in asserting a right does not, without more, establish laches. Rather, the person invoking the doctrine must show that the delay caused material prejudice." *Id.*, citing *Connin* at 35-36.

**{¶ 48}** Cleveland claims it should be granted summary judgment based on laches because the elements for laches are satisfied in this case. Cleveland claims that there is no excuse for Brook Park's delay in filing the complaint nearly a decade after Cleveland undisputedly breached the agreement in May 2007; Brook Park has not suffered any injury or wrong because Brook Park does not own any of the real estate in question; and Cleveland would be severely prejudiced by being forced to

expend taxpayer dollars to purchase a large swath of real estate located in Brook Park for a construction project abandoned by Cleveland many years ago.

{¶ 49} Brook Park argues that its 2017 complaint is not barred by latches because Cleveland did not breach the Agreement until April 2016, when it declined to exercise the option for Phase II. As we have explained in the foregoing, this contention relies on the MOU, which reclassifies Zones 5 and 6 as part of Phase II, but, as Brook Park maintains and Cleveland admits, the MOU is void.

{¶ 50} Brook Park next argues that, even if Cleveland is considered to have breached the Agreement in May 2007 when Cleveland announced in a press release that it would not purchase homes in Zones 5 and 6, Brook Park's claim is not barred by laches. Brook Park alleges that, despite the nullity of the MOU, "Cleveland led Brook Park to believe that Cleveland would treat Zones 5 and 6 as part of the optional phase" and that "Brook Park believed that it was required to wait and see if Cleveland would exercise its option to purchase the properties in Phase II," citing the May 2007 press release. Brook Park alleges that the homeowners in Zones 5 and 6 have "lived in limbo" before the expiration of Cleveland's option for Phase II, not knowing if Cleveland would exercise the option. Because Cleveland's option for Phase II did not expire until April 2016, Book Park claims there is no undue delay in filing the lawsuit in 2016.

{¶ 51} Brook Park also asserts that Cleveland presented no evidence such as economic studies, industry reports, or any updated plans for the airport to support its claim that it was prejudiced by Brook Park's delay in asserting its claims.

{¶ 52} To prevail on the defense of laches, Cleveland carries the burden to prove by a preponderance of evidence that Brook Park's delay in filing the lawsuit is unreasonable, there is no excuse for Brook Park's delay, Brook Park knew the wrong caused by its delay, and Cleveland was prejudiced by the delay. Our review of the record indicates there are no undisputed material facts in the record establishing the essential elements of laches. Because issues of fact exist regarding whether Brook Park's complaint is barred by laches, summary judgment in favor of Cleveland based on laches would be improper.

### F. Conclusion

{¶ 53} Having reviewed the record and applicable law, we conclude that Brook Park has standing to bring the instant complaint for breach of contract and the complaint is not barred by the applicable statute of limitations for a written contract. We also conclude summary judgment based on Cleveland's claim that the remedy of specific performance is inequitable, or on the doctrine of laches, is not warranted because there are issues of fact to be determined.

{¶ 54} Accordingly, we sustain Brook Park's first assignment of error, overrule its second assignment of error, and remand this matter to the trial court for further proceedings consistent with this opinion.

### G. Cleveland's Motion to Dismiss For Lack of Subject Matter Jurisdiction

{¶ 55} During the pendency of this appeal, Cleveland filed a motion to dismiss the appeal, claiming, for the first time since Brook Park filed the instant complaint in 2017, that the trial court lacks subject-matter jurisdiction because this matter is moot. Cleveland's motion to dismiss lacks merit.

{¶ 56} "'Subject-matter jurisdiction of a court connotes the power to hear and decide a case upon its merits' and 'defines the competency of a court to render a valid judgment in a particular action.'" *Cheap Escape Co. v. Haddox, L.L.C.*, 120 Ohio St.3d 493, 2008-Ohio-6323, 900 N.E.2d 601, ¶ 6, quoting *Morrison v. Steiner*, 32 Ohio St.2d 86, 87, 290 N.E.2d 841 (1972). A court without subject-matter jurisdiction lacks the power to adjudicate the merits of a case, and therefore, a party may challenge jurisdiction at any time during the proceedings. *Pratts v. Hurley*, 102 Ohio St.3d 81, 2004-Ohio-1980, 806 N.E.2d 992, ¶ 11. We review the issue of subject-matter jurisdiction de novo. *Klosterman v. Turnkey-Ohio, L.L.C.*, 182 Ohio App.3d 515, 2009-Ohio-2508, ¶ 19 (10th Dist.),

{¶ 57} Furthermore, the Ohio Constitution limits the original jurisdiction of common pleas courts to "justiciable matters. Ohio Constitution, Article IV, Section 4(B). "When a case becomes moot, dismissal of the case is appropriate because the case no longer presents a justiciable controversy." *Amujiogu v. Oko*, 8th Dist. Cuyahoga No. 110922, 2022-Ohio-1323, ¶ 4. As the Supreme Court of Ohio

explained, an action is moot when it becomes "'fictitious, colorable, hypothetical, academic or dead'" and involves "'no actual genuine, live controversy.'" *State ex rel. Cincinnati Enquirer v. Hunter*, 141 Ohio St.3d 419, 2014-Ohio-5457, 24 N.E.3d 1170, ¶ 4, quoting *In re L.W.*, 168 Ohio App.3d 613, 2006-Ohio-644, 861 N.E.2d 546, ¶ 11, (10th Dist.).

{¶ 58} Cleveland claims in its motion that this case is moot and no longer a justiciable matter and, therefore, the trial court lacks jurisdiction to entertain it because "the situation in which the Settlement Agreement was executed 'fundamentally changed' in 2001, [and] it is impossible for the tribunal to grant meaningful relief to Brook Park." Cleveland's claim is predicated on the same argument that, although Brook Park's complaint sounds in breach of contract, it should be construed as seeking the relief of a court order compelling Cleveland to exercise its eminent domain power to acquire the subject properties. Cleveland argues that, because the public purpose for the property acquisition no longer existed, it could not exercise eminent domain power to acquire the properties and no meaningful relief can be provided by the court. Cleveland claims that, therefore, this matter is moot and not justiciable.

{¶ 59} As we have reasoned in the foregoing analysis, Brook Park's action against Cleveland is one for breach of contract. The parties contracted for Cleveland to purchase certain properties located in Brook Park in the manner set forth in the Agreement. Brook Park's breach-of-contract claim, regardless of its merit, is by no

means fictitious, hypothetical or dead. Cleveland's claim that the matter is moot and, therefore, the trial court lacks subject-matter jurisdiction to adjudicate it is without merit. The motion to dismiss is denied.

{¶ 60} Judgment reversed, and matter remanded to the trial court for further proceedings consistent with this opinion.

It is ordered that appellant recover of said appellee costs herein taxed. The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure

_____
MICHELLE J. SHEEHAN, JUDGE

KATHLEEN ANN KEOUGH, P.J., and
EILEEN T. GALLAGHER, J., CONCUR